## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

NICOLE MARIE RUBENDALL,

            Plaintiff

    v.

CAROLYN W. COLVIN,
Commissioner of the Social Security
Administration

          Defendant

CIVIL ACTION NO. 1:15-CV-1266


(KANE, J.)
(MEHALCHICK, M.J.)

---

## REPORT AND RECOMMENDATION

This is an action brought under Section 1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3)(incorporating 42 U.S.C. § 405(g) by reference) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Nicole Marie Rubendall's ("Ms. Rubendall's") claim for supplemental security income under Title XVI of the Social Security Act.[1] This matter has been referred to the undersigned United States Magistrate Judge to prepare a report and recommended disposition pursuant to the provisions of 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons expressed herein, it is recommended that the Commissioner's decision be **AFFIRMED**, and that Ms. Rubendall's request for relief be **DENIED**.

---

[1] The record of the administrative proceedings in this case reflects that Ms. Rubendall applied for benefits under Title II and Title XVI of the Social Security Act. (Doc. 9-5, at 3-10; Admin. Tr. 94-101). In this case, it appears that the ALJ's ruling and the scope of Ms. Rubendall's appeal in this case are limited to the denial of her Title XVI claim.

## I. PROCEDURAL HISTORY

On September 4, 2012, Ms. Rubendall filed a Title XVI application for supplemental security income alleging that she has been disabled since her birth due to depressive disorder, anxiety, post-traumatic stress disorder ("PTSD"), obsessive compulsive disorder ("OCD"), and oppositional defiant disorder ("ODD").

The record reflects a significant history of psychiatric problems. Ms. Rubendall was hospitalized twice at Hershey Medical Center in 2006, and had a history of "cutting" since fifth grade. (Doc. 9-10, p. 97; Admin. Tr. 540). In June 2008, when she was only fifteen years old, Ms. Rubendall was admitted to Philhaven for seven days inpatient psychiatric treatment. After a short gap in treatment, she underwent a psychiatric evaluation with Dr. Lorraine Wharton-Mohammed ("Dr. Wharton-Mohammed") during a second hospitalization at Philhaven in October 2008. Dr. Wharton-Mohammed noted that Ms. Rubendall has a history of self-harming behaviors, sexual identity issues, cognitive limitations, and reported having contact with a ghost. (Doc. 9-10, p. 99; Admin. Tr. 542).

On August 16, 2011, Dr. Jeffrey A. Okamoto examined Ms. Rubendall. He noted that Ms. Rubendall's depression and anger outbursts were under control. Ms. Rubendall felt that she did not need medications at this time, and Dr. Okamoto was in agreement. (Doc. 9-10, p. 91-92; Admin. Tr. 534-35).

On October 13, 2011, Ms. Rubendall was examined by Dr. Matthew Weitzal ("Dr. Weitzal") to establish care, and to have medical assistance forms completed. (Doc. 9-10, pp. 119-20; Admin. Tr. 562-63). Ms. Rubendall reported that she was out of the medications prescribed by her psychiatrist, but was not having any symptoms. Dr. Weitzal noted that Ms.

Rubendall's reports about the history of her anxiety and depression were not consistent. Dr. Weitzal refused to fill out Ms. Rubendall's forms for medical assistance until he had an opportunity to review Ms. Rubendall's medical records. On December 12, 2011, Ms. Rubendall followed-up with Dr. Rachel A. Eash Scott ("Dr. Eash Scott") at the same office. Dr. Eash Scott reported a diagnostic impression of depression, and completed Ms. Rubendall's medical assistance forms. (Doc. 9-10, pp. 115-17; Admin. Tr. 558-60). Dr. Eash Scott also prescribed Lamictal and Zoloft. *Id.* On May 7, 2012, Ms. Rubendall was examined by Dr. Eash Scott with complaints of back pain. Ms. Rubendall reported that she cuts herself when depressed, was not suicidal, and was not currently taking her prescribed medications. (Doc. 9-10, at 112; Admin. Tr. 555). On June 26, 2012, Ms. Rubendall told Dr. Eash Scott that her back pain was "tolerable" and was "not keeping her from activities," and that she was not on any medication. (Doc. 9-10, p. 103; Admin. Tr. 546).

On September 25, 2012, Ms. Rubendall sought psychiatric treatment Dr. Yury Yaroslavsky ("Dr. Yaroslavsky") at T.W. Ponessa & Associates. During this examination Dr. Yaroslavsky completed a psychiatric evaluation. (Doc. 9-7, pp. 92-94; Admin. Tr. 294-96). On mental status examination Dr. Yaroslavsky noted that Ms. Rubendall was neatly dressed, and was compliant during the examination. He reported that Ms. Rubendall's though process was linear and goal-directed, that Ms. Rubendall admitted to being depressed, that Ms. Rubendall had a dysphoric (uneasy) and anxious affect, and that Ms. Rubendall presented with symptoms of PTSD and OCD related to order and cleanliness. Ms. Rubendall also told Dr. Yaroslavsky that her moods were unstable and that she becomes easily irritated. Ms. Rubendall's memory and concentration were intact, and she appeared to be of average intelligence. Dr. Yaroslavsky

- 3 -

diagnosed mood disorder, rule out bipolar disorder, PTSD, OCD, polysubstance abuse (in remission), alcohol abuse (in early remission), borderline personality disorder vs. personality traits (per history), and assessed that Ms. Rubendall's Global Assessment of Functioning ("GAF") score on September 25, 2012, as 50. Dr. Yaroslavsky also noted that Ms. Rubendall was overweight. Dr. Yaroslavsky assessed that Ms. Rubendall maintained a current GAF score of 50 during each examination.

During the initial administrative review of her Title II claim Psychologist Erin Urbanowicz ("Dr. Urbanowicz") completed the Psychiatric Review Technique ("PRT") assessment and a mental Residual Functional Capacity Assessment ("RFC") based on the records that were available prior to October 15, 2012. Dr. Urbanowicz assessed that Ms. Rubendall had medically determinable mental impairments that did not precisely satisfy the criteria of listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.09 (substance addiction disorders) of 20 C.F.R. Part 404, Subpart P, Appendix 1. She also opined that these impairments resulted in a mild restriction of activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. (Doc. 9-3, p. 5; Admin. Tr. 69). In her RFC assessment, Dr. Urbanowicz assessed that Ms. Rubendall could: perform simple, routine repetitive tasks in a stable environment; understand, retain, follow, and carry out very short and simple job instructions (i.e., perform one and two step tasks); make simple decisions; sustain a work routine without special supervision; ask simple questions and request assistance; and, meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment. (Doc. 9-3, pp. 6-8; Admin. Tr. 70-72).

On October 24, 2012, Ms. Rubendall was notified that her Title XVI claim was denied at the initial level of administrative review. (Doc. 9-4, p. 2; Admin. Tr. 76). Thereafter, Ms. Rubendall requested an administrative hearing. Between the initial administrative denial of her claim and her administrative hearing, however, Ms. Rubendall continued to supplement the record.

On July 18, 2013, Therapist Natalie Rebman, M.S. ("Therapist Rebman") completed a medical source statement. (Doc. 9-10, pp. 122-27; Admin. Tr. 565-70). Therapist Rebman reported that she has contact with Ms. Rubendall once per week for approximately forty-five minutes at one time. Therapist Rebman also reported that Ms. Rubendall's current diagnoses include: bipolar disorder, mixed without psychosis; PTSD; OCD; polysubstance dependence; and borderline personality disorder. Ms. Rubendall's Global Assessment of Functioning ("GAF") score on or around July 18, 2013, was 50. Therapist Rebman reported that Ms. Rubendall's symptoms include: blunt, flat, or inappropriate affect; feelings of guilt or worthlessness; impairment in impulse control; persistent anxiety; mood disturbance; difficulty thinking or concentrating; mood disturbance; recurrent, intrusive, and distressing recollections of a traumatic experience; psychomotor agitation or retardation; persistent disturbance of mood or affect; recurrent obsessions or compulsions which are a source of marked distress; emotional withdrawal or isolation; intense and unstable interpersonal relationships and impulsive and damaging behavior; emotional lability; deeply ingrained, maladaptive patterns of behavior; and easy distractibility.

Therapist Rebman opined that Ms. Rubendall's impairments resulted in a moderate restriction in activities of daily living, marked difficulties maintaining social functioning,

moderate difficulties maintaining concentration, persistence, or pace, and three episodes of decompensation lasting two weeks or more within a twelve month period. (Doc. 9-10, p. 126; Admin. Tr. 569).

With respect to Ms. Rubendall's functional capabilities, Therapist Rebman assessed that Ms. Rubendall had: unlimited or "very good" aptitude for understanding, remembering, carrying out very short and simple instructions, and adhering to basic standards of neatness and cleanliness; limited but satisfactory aptitude for remembering work-like procedures, maintaining regular attendance, sustaining a routine without special supervision, asking simple questions, requesting assistance, taking precautions to avoid normal hazards, understanding, remembering, and carrying out detailed instructions, and using public transportation; and, seriously limited aptitude for, but was not precluded from, maintaining attention for two hours, making simple work-related decisions, completing a normal workday or workweek without undue interference from her symptoms, performing at a consistent pace, responding appropriately to changes in a routine work setting, setting realistic goals, making plans independent of others, interacting with the general public, maintaining socially acceptable behavior, and traveling to an unfamiliar place. (Doc. 9-10, pp. 124-26; Admin. Tr. 567-69). Therapist Rebman assessed that Ms. Rubendall would be unable to meet competitive standards (i.e., would be unable to satisfactorily perform) the following activities: working in coordination with or proximity to others without being distracted; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; dealing with normal work stress of semi-skilled or skilled work. *Id.* She also opined that Ms. Rubendall would be absent from work

approximately four days per month due to her impairments or treatment. (Doc. 9-10, p. 127; Admin. Tr. 570). Therapist Rebman explained that it seemed "unlikely that Nicole would be able to maintain behavioral expectations of employment due to obsessive compulsive symptoms, mood swings, and PTSD," that Ms. Rubendall's "[p]ersonality disorder symptoms are likely to limit her ability to function socially with co-workers or interact with the public," and that her "anxiety symptoms can limit focus, memory, and attention." (Doc. 9-10, p. 125; Admin. Tr. 568).

In August 2013, Ms. Rubendall began seeing a second psychiatrist, Dr. Vastili V. Arkadiev ("Dr. Arkadiev") at T.W. Ponessa & Associates. (Doc. 9-10, pp. 155-57; Admin. Tr. 598-600). On September 9, 2013, Dr. Arkadiev conducted a psychiatric evaluation to obtain more information about Ms. Rubendall's past and present symptoms. *Id.*  On mental status examination Dr. Arkadiev noted that Ms. Rubendall was obese and appeared to be older than her stated age (20). He reported that Ms. Rubendall's thought process was coherent and logical, but that that Ms. Rubendall had an inappropriate, dramatic, and constricted affect. Ms. Rubendall admitted that her concentration and attention were fair, but that she was plagued by feelings of hopelessness and helplessness, and hallucinations, pseudo hallucinations, PTSD hallucinations, and possibly true hallucinations. Ms. Rubendall's insight and judgment were "fair," and she appeared to be of average or slightly below average intelligence. Dr. Arkadiev diagnosed bipolar disorder, PTSD, OCD, and borderline personality disorder, and assessed that Ms. Rubendall's GAF score on September 9, 2013, as 50. Dr. Arkadiev also noted that Ms. Rubendall was obese. During subsequent appointments, Ms. Rubendall's GAF score ranged from 50 to 55.

A hearing was convened before ALJ Randy Riley on November 21, 2012. Ms. Rubendall appeared and testified with the assistance of counsel. Impartial vocational expert Paul A. Anderson ("VE Anderson") also appeared and testified during the hearing. On February 12, 2014, the ALJ issued a written decision denying Ms. Rubendall's claims. Ms. Rubendall requested review of the ALJ's decision by the Appeals Council of the Office of Disability Adjudication and Review. Her request was denied on April 28, 2015, making the ALJ's February 2014 decision the final decision of the Commissioner subject to judicial review by this Court.

Ms. Rubendall filed the complaint in this action on June 28, 2015. (Doc. 1). Ms. Rubendall alleges that the ALJ's decision is not supported by substantial evidence and is based on the incorrect legal principles. (Doc. 1 ¶13). As relief she requests that this Court award benefits, or in the alternative, remand this case for a new administrative hearing. (Doc. 1 ¶14). On September 2, 2015, the Commissioner filed her answer. (Doc. 8). In her answer, the Commissioner asserts that the ALJ's findings of fact are supported by substantial evidence, and that the decision was made in accordance with the law and regulations. (Doc. 8 ¶10). Together with her answer, the Commissioner filed a certified transcript of the entire record of the administrative proceedings. (Doc. 9). This matter has been fully briefed by the parties and is now ripe for decision. (Doc. 11; Doc. 13; Doc. 14).

## II.   STANDARD OF REVIEW

To receive benefits under Title XVI of the Social Security Act, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). To satisfy this requirement, the claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in significant number in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

In evaluating the question of whether a claimant is under a disability as it is defined in the Social Security Act, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. § 416.920(a). Under this process, the Commissioner must determine, in sequence: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 ("Listing of Impairments"); (4) whether the claimant is able to do his past relevant work, considering his current residual functional capacity ("RFC");[2] and, (5) whether the claimant is able to do any other work that exists in significant numbers in the national economy, considering his current RFC, age, education, and work experience. Id. The claimant bears the initial burden of demonstrating a medically determinable impairment that prevents him from doing his past relevant work. 20 C.F.R. § 416.912(a). Once the claimant has established at step four that he cannot do past relevant work, the burden then shifts to the Commissioner at step five to show that jobs exist in

---

[2] A claimant's RFC is the most a claimant can still do despite his limitations. 20 C.F.R. § 416.945(a)(1); see also Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000). Before the ALJ goes from step three to step four, he or she assesses the claimant's RFC. 20 C.F.R. § 416.920(a)(4). The RFC is used at step four and step five to evaluate the claimant's case.

significant numbers in the national economy that the claimant could perform that are consistent with his RFC, age, education, and past work experience. 20 C.F.R. § 416.912(f).

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C. §1383(c)(3)(incorporating 42 U.S.C. §405(g) by reference); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200(3d Cir. 2008); *Ficca v. Astrue*, 901 F.Supp.2d 533, 536(M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D.Pa. 2003). The question before this Court, therefore, is not whether Ms. Rubendall is disabled, but whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-

02417, 2014 WL 940205, at *1 (M.D.Pa. Mar. 11, 2014)("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.")(alterations omitted); *Burton v. Schweiker*, 512 F.Supp. 913, 914 (W.D.Pa. 1981)("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990)(noting that the scope of review on legal matters is plenary); *Ficca*, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

## III.   THE ALJ'S DECISION

In his February 2014 decision denying Ms. Rubendall's Title XVI claim, the ALJ assessed Ms. Rubendall's case at each step of the five-step sequential evaluation process before concluding that Ms. Rubendall was "not disabled" at any point between September 4, 2012, and February 12, 2014, because she could adjust to other work that exists in the national economy. At step one the ALJ found that Ms. Rubendall did not engage in substantial gainful activity between September 4, 2012, and February 12, 2014. (Doc. 9-2, p. 15; Admin. Tr. 14). At step two the ALJ found that, during the relevant period, Ms. Rubendall had the following medically determinable, severe impairments: Bipolar Disorder, PTSD, OCD, and Personality Disorder. *Id.* In his narrative discussion of Ms. Rubendall's medically determinable severe impairments, the ALJ also noted that Ms. Rubendall suffered from polysubstance abuse in remission. *Id.* At step three the ALJ found that, during the relevant period, Ms. Rubendall did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 9-2, pp. 15-16; Admin. Tr. 14-15).

Between steps three and four, the ALJ assessed Ms. Rubendall's RFC. The ALJ assessed that, during the relevant period, Ms. Rubendall had the RFC to perform a full range of work at all exertional levels with the following additional nonexertional limitations:

> the claimant's work is limited to simple, routine, repetitive tasks in a work environment free from fast-paced production. It should involve only simple work-related decisions with few, if any, workplace changes. The claimant should have no interaction with the public. She is able to tolerate occasional interaction with supervisors and co-workers, but cannot perform tandem tasks.

(Doc. 9-2, p. 17; Admin. Tr. 16).

At step four of the sequential evaluation process, the ALJ noted that Ms. Rubendall had no past relevant work. (Doc. 9-2, p. 21; Admin. Tr. 20). The ALJ's findings at step five of the sequential evaluation process were based on the above-quoted RFC, and informed by VE Anderson's testimony. In response to a hypothetical question that mirrors the RFC above, VE Anderson testified that an individual of the same age, education, and RFC as Ms. Rubendall could adjust to work in the following representative occupations: Bakery Worker, Conveyor Line (DOT #524.687-022); Cleaner/Housekeeper (DOT #323.687-014); and Egg Washer (DOT #529.686-030). VE Anderson also testified that there are approximately 37,500 jobs as a Bakery Worker, Conveyor Line in the national economy, 377,500 jobs as a Cleaner/Housekeeper in the national economy, and 760,200 jobs as an Egg Washer in the national economy. (Doc. 9-2, pp. 63-34; Admin. Tr. 62-63). Based on this information, the ALJ found that Ms. Rubendall could adjust to other work that exists in significant numbers in the national economy, and therefore did not meet the statutory definition of disability. (Doc. 9-2, pp. 21-22; Admin. Tr. 20-21).

IV.   ANALYSIS

    A.   WHETHER THE ALJ ERRED BY FAILING TO ADDRESS MS. RUBENDALL'S OBESITY

Although Ms. Rubendall did not allege any impairment due to obesity, her medical records reflect that she was obese throughout the relevant period. Ms. Rubendall argues that her medical records put the ALJ on notice of her obesity as a medically determinable impairment, and that it was error for the ALJ to fail to mention this impairment in his decision. She contends that this error requires remand. In response, the Commissioner argues that Ms. Rubendall's argument is without merit because Ms. Rubendall did not allege that her obesity as a disabling impairment and did not identify any limitations resulting from this condition.

At step two of the sequential evaluation process the ALJ is charged with the responsibility of determining whether the claimant's impairments are medically determinable, and whether any medically determinable impairment is severe or non-severe. The Commissioner's regulations provide that "[a]n impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] ability to do basic work activities."[3] 20 C.F.R. § 416.921(a); SSR 85-28, 1985 WL 56856; SSR 96-3p, 1996 WL 374181. This analysis is essentially a threshold test; therefore any doubt as to whether a claimant has made a sufficient showing of severity at step two should be resolved in favor of the claimant. *McCrea v. Comm'r of*

_____

[3] Basic work activities are "the activities and aptitudes to do most jobs." 20 C.F.R. § 416.921(b). Examples of these activities include: the physical functions of walking, standing, sitting lifting pushing pulling, reaching, or handling; the capacities to see, hear, or speak; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. *Id.*

*Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). However, given the limited scope of the Court's review of these cases, a claimant alleging that remand is necessary based on a step two error should articulate whether the error resulted in any prejudice at subsequent steps of the sequential evaluation process. *See e.g. Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)(finding that a generalized response that a claimant's weight makes it "difficult to stand, walk, and manipulate her hands and fingers" was not enough to warrant remand because the ALJ's consideration of the voluminous medical record constituted a satisfactory, if indirect, consideration of a claimant's obesity).

Policy guidance on the evaluation of obesity provides that, when establishing the existence of obesity as a medically determinable impairment the ALJ will generally rely on the judgment of a physician who has examined the claimant, and in the absence of contrary evidence will accept a diagnosis of obesity by a treating source or consultative examiner. SSR 02-1p, 2002 WL 34686281 at *3. The Commissioner has also explained that the guidelines articulated in SSR 85-28 and SSR 96-3p apply to the evaluation of the severity of a claimant's medically determinable obesity. *Id.* at 4.

In support of her response, the Commissioner relies on the Third Circuit's decision in *Rutherford*, which held that a remand to discuss a claimant's obesity in a case where the claimant did not initially claim, and the ALJ did not recognize, obesity as an impairment was harmless error because it would not affect the outcome of the case. 399 F.3d at 552-54. Three years later, in *Diaz v, Comm'r of Soc. Sec.*, the Third Circuit reached the opposite conclusion where an ALJ recognized obesity as a medically determinable severe impairment at step two

but failed to address it at any subsequent step of the sequential evaluation process. 577 F.3d 500, 503 (3d Cir. 2009).

In this case, the parties do not dispute that Ms. Rubendall was obese during the relevant period. Instead, Ms. Rubendall argues that it was error for the ALJ to omit her obesity in his written decision because Ms. Rubendall's medical records put him on notice of this condition. The Court finds that this case is distinguishable from *Diaz*, and that, as in *Rutherford*, remand is not warranted. Unlike in *Diaz*, and like *Rutherford*, Ms. Rubendall did not allege that obesity was a condition or impairment that affected her ability to work. Furthermore, Ms. Rubendall has not made any attempt to explain how her alleged impairment due to obesity would affect the outcome in this case by identifying the symptoms of her medically determinable impairments that are exacerbated by her obesity. Instead, Ms. Rubendall generally asserts that SSR 02-1p recognizes that obesity "may increase the severity of" coexisting physical and mental impairments.[4] The Court finds that the ALJ's failure to consider Ms. Rubendall's obesity in this instance is harmless, because she has failed to show it resulted in any prejudice in this case.

---

[4] Ms. Rubendall also suggests that her obesity increases the severity of her back pain and sleep disturbances. However, like her obesity, Ms. Rubendall did not allege any significant impairment due to sleep disturbance, and only briefly mentioned that it was difficult for her to stand "a lot" due to scoliosis. (*see* Doc. 9-2, p. 62; Admin. Tr. 61). The ALJ did not find any medically determinable back or sleep impairment, and Ms. Rubendall does not allege that the ALJ failed to evaluate these impairments at step two. Where there is a medically determinable physical or mental impairment, but the impairment could not reasonably be expected to produce the claimant's symptoms, the symptoms cannot be found to affect the claimant's work activities. SSR 96-7p, 1996 WL 374186 at *2.

B. Whether the ALJ's Evaluation at Step Three Is Supported by Substantial Evidence

Next, Ms. Rubendall alleges that the ALJ erred at step three of the sequential evaluation process when he concluded that Ms. Rubendall did not satisfy listings 12.04 and 12.06 of 20 C.F.R. Part 404, Subpart P, Appendix 1.[5]

At step three of the sequential evaluation process, the ALJ must determine whether a claimant's alleged impairment is equivalent to a number of listed impairments that are acknowledged to be so severe as to preclude substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(iii); 20 C.F.R. § 416.925; Burnett, 220 F.3d at 119. If a claimant's impairment meets or equals one of the listed impairments, then the claimant is considered disabled *per se*, and is awarded benefits. 20 C.F.R. §416.920(d); Burnett, 220 F.3d at 119. This standard is stringent. To qualify for benefits at step three of the sequential evaluation process a claimant bears the burden of presenting "medical findings equivalent in severity to *all* the criteria for the one most similar impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); 20 C.F.R. § 416.920(d). Impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not sufficient. *Sullivan*, 493 U.S. at 531.

---

[5] Ms. Rubendall also argues that the ALJ erred by failing to consider the childhood disability listings 112.04 and 112.06 because Ms. Rubendall alleges that she has been disabled from birth. Under Title XVI, there is no retroactivity of payment. SSR 83-20, 1983 WL 31249 at *1. Supplemental security income payments are prorated for the first month in which eligibility is established *after* application and after a period of ineligibility. 20 C.F.R. § 416.335; SSR 83-20, 1983 WL 31249. In this case, Ms. Rubendall filed her application for benefits on September 4, 2012, when she had already attained age 18. As such, the Court finds that the ALJ appropriately evaluated Ms. Rubendall's Title XVI under the standard for adult disability.

With respect to the mental disorder listings implicated in the instant matter, the Commissioner's regulations explain that a claimant must meet the criteria of paragraph A of the listing, and the criteria of paragraphs B or C of the listing. 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00A. Paragraph A of listings 12.04 and 12.06 describe the specific signs, symptoms, and laboratory findings to establish the existence of the impairment at issue. *Id.* The paragraph A criteria must be considered in conjunction with the description of the mental disorder contained at the beginning of the listing category. *Id.* The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to work. *Id.* To meet the paragraph B or C criteria, the functional limitation must be the result of the medical disorder described in the diagnostic description of the listing that is manifested by the medical findings in paragraph A. *Id.*

As an initial matter, the Court notes that Ms. Rubendall devotes significant discussion to whether she meets the paragraph A criteria of each listing. The ALJ in this case did not make any finding on the issue of whether Ms. Rubendall met the paragraph A criteria. Instead, his conclusion at step three is based on his assessment that Ms. Rubendall did not satisfy the paragraph B or C criteria of listings 12.04 and 12.06. Ms. Rubendall also argues that the ALJ erred by finding that Ms. Rubendall did not meet the paragraph B criteria of listings 12.04 and 12.06. Because the scope of the Court's review is limited to the assessment of whether an ALJ's findings are supported by substantial evidence, and because the ALJ made no findings with respect to the paragraph A criteria, the Court will confine its discussion to whether the ALJ's assessment that Ms. Rubendall did not meet the paragraph B criteria of listings 12.04 and 12.06 is supported by substantial evidence.

The paragraph B criteria of listings 12.04 and 12.06 are identical. They require that the listed impairment result in at least two of the following: marked restriction of activities of daily living; marked difficulties maintaining social functioning; marked difficulties maintaining concentration, persistence, or pace; and repeated episodes of decompensation of extended duration.[6] In his decision, the ALJ found that Ms. Rubendall had a mild restriction in activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration persistence or pace, and no episodes of decompensation. (Doc. 9-2, p. 16; Admin. Tr. 15). Ms. Rubendall contends that she has marked difficulties maintaining social functioning, and marked difficulties maintaining concentration, persistence, or pace. (Doc. 11, pp. 21-24).

Pursuant to 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00C3, concentration, persistence, or pace refers to:

> the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

---

[6] The degree of limitation in the first three functional areas of the paragraph B criteria is rated on the following five-point scale: none, mild, moderate, marked, extreme. 20 C.F.R. § 416.920a(c)(4). The fourth functional area (episodes of decompensation) is rated on the following four-point scale: none, one or two, three, four or more. *Id.*

On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits.

In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks (e.g., filing index cards, locating telephone numbers, or disassembling and reassembling objects). Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective.

Although Ms. Rubendall alleges that she has difficulty completing tasks she starts, following directions, and handling stress or changes in routine, there has been very little clinical testing of the extent of her limitations. Ms. Rubendall argues that she exhibited a greater degree of limitation in this area when she was voluntarily admitted to Philhaven for psychiatric treatment, and recent treatment notes documenting her low concentration and motivation, and Therapist Rebman's opinion that she would be seriously limited but not precluded from maintaining attention for two hours.

In response, the Commissioner contends that, even if Therapist Rebman's opinion was credited, her opinion would not substantiate a claim that Ms. Rubendall had "marked" limitations in concentration, persistence, or pace, and is directly contradicted by Dr. Urbanowicz's opinion. The Court agrees with the Commissioner that, although Ms. Rubendall clearly has some limitation in the area of concentration, persistence, and pace, no source (including Therapist Rebman) substantiates her claim that she has a "marked" limitation in concentration, persistence, or pace. In fact, both Dr. Urbanowicz and Therapist Rebman opined that Ms. Rubendall had only "moderate" limitations in concentration, persistence, or

pace. The ALJ accorded "significant" weight to Dr. Urbanowicz's assessment. Accordingly, the Court finds that the ALJ's determination that Ms. Rubendall had "moderate," rather than "marked" limitations in concentration, persistence, or pace is supported by substantial evidence.

Furthermore, as discussed above, to prevail on her argument that she is entitled to benefits under listing 12.04 and 12.06, or that remand is warranted because the ALJ's analysis at step three is not supported by substantial evidence, Ms. Rubendall must show that there is at least some likelihood that she meets all the criteria of one or both of these listings. In this case, because the Court has found that the ALJ's determination that Ms. Rubendall had only moderate limitations in concentration, persistence, or pace is supported by substantial evidence, it need not address her allegations that she has "marked" difficulty maintaining social functioning. As discussed above, to meet paragraph B a claimant must demonstrate two marked limitations. Because she has failed to show that she has "marked" difficulty maintaining concentration, persistence, or pace, even if the Court found error in the ALJ's assessment of her ability to maintain social functioning, this error would not qualify her for benefits under listings 12.04 or 12.06, and would not warrant remand.

C. WHETHER THE ALJ PROPERLY WEIGHED THE MEDICAL OPINION EVIDENCE

Next, Ms. Rubendall argues that the ALJ accorded too much to the opinion of Dr. Urbanowicz while according to little weight to Therapist Rebman and several treating source GAF scores.

### 1. The ALJ Properly Discounted Therapist Rebman's Medical Source Statement

Ms. Rubendall contends that the ALJ improperly discounted Therapist Rebman's opinion on the basis that she is not an "acceptable medical source," and failed to identify any inconsistent evidence before discounting Therapist Rebman's opinion. (Doc. 11, p. 27).

At the outset, the Court notes that pursuant to SSR 06-3p adjudicators should weigh opinions by medical sources that are not "acceptable medical sources" based on the same factors used to evaluate opinions by acceptable medical sources, with one exception. SSR 06-3p, 2006 WL 2329939 at *4. "[O]nly 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight." Id. at 2. Thus, to the extent Ms. Rubendall argues that Therapist Rebman's opinion is entitled to controlling weight, the Court finds that this argument lacks merit.[7]

---

[7] Ms. Rubendall also contends that the ALJ was obligated to recontact Therapist Rebman pursuant to the recontact provision of SSR 96-5p. (Doc. 11, p. 27). This policy ruling provides that:

> Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make "every reasonable effort" to recontact the source for clarification of the reasons for the opinion.

SSR 96-5p, 1996 WL 374183 at *6. The Commissioner's regulations define a "treating source" as a "physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 416.902. An "acceptable medical source" is a licensed physician, or licensed or certified psychologist, and under limited circumstances an optometrist, podiatrist, or speech-language pathologist. 20 C.F.R. § 416.913(a). SSR 06-3p lists "therapist" as a medical source that is not an "acceptable medical source." 2006 WL 2329939 at *2.

Next, the Court turns its attention to the issue of whether the ALJ's decision to accord "limited" weight to Therapist Rebman's opinion is proper under the Commissioner's regulations. The Commissioner's regulations, read in conjunction with SSR 06-3p, require that the opinion evidence of record based on the following factors: how long the source has known, and how frequently the source has seen the claimant; how consistent an opinion is with other evidence; the degree to which the source presents relevant evidence to support the opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the claimant's impairments; and any other relevant factors. 20 C.F.R. § 416.927(c). Furthermore, such determinations must be accompanied by "a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)(*quoting Mason*, 994 F.2d at 1066)); *see also Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).

In his decision, the ALJ explained that, "[l]imited weight is given to the opinions of Ms. Rebman, who is not an acceptable medical source and overstates the claimant's functional impairment compared to the psychiatrists' and psychologist's opinions." (Doc. 9-2, p. 20; Admin. Tr. 19). SSR 06-3p provides that:

> The fact that a medical opinion is from an "acceptable medical source" is a
> factor that may justify giving that opinion greater weight than an opinion from a

Thus, because Therapist Rebman is not a "treating source" under the Commissioner's regulations, the recontact provision of SSR 96-5p does not apply.

medical source who is not an "acceptable medical source" because, as we previously indicated in the preamble to our regulations at 65 FR 34955, dated June 1, 2000, "acceptable medical sources" "are the most qualified health care professionals." However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. Giving more weight to the opinion from a medical source who is not an "acceptable medical source" than to the opinion from a treating source does not conflict with the treating source rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p, "Titles II and XVI: Giving Controlling Weight To Treating Source Medical Opinions."

2006 WL 2329939 at *5. Although the record is clear that Ms. Rubendall was seen by Therapist Rebman more often than she was examined by Dr. Arkadiev and Dr. Yaroslavsky, the ALJ found that her opinion was inconsistent with other record evidence, specifically: the September 25, 2012, psychiatric assessment by Dr. Yaroslavsky (psychiatrist); the October 15, 2012, RFC assessment by Dr. Urbanowicz (psychologist); and, the September 9, 2013, psychiatric assessment by Dr. Arkadiev (psychiatrist).

Further, the Court notes that it was not unreasonable for the ALJ to conclude that the clinical findings in the treating source psychiatric evaluations were inconsistent with Therapist Rebman's opinions. Dr. Urbanowicz's opinion was based, at least in part, on Dr. Yaroslavsky's psychiatric evaluation, and is considerable less restrictive than Therapist Rebman's assessment. Accordingly, the Court finds Ms. Rubendall's argument that the ALJ failed to cite any inconsistent evidence is meritless.

### 2.   The ALJ Properly Assessed the GAF Scores of Record

In his decision the ALJ addressed the multiple GAF scores of record as follows:

Regarding the Global Assessment of Functioning scores in the medical evidence of record, a Global Assessment of Functioning (GAF) score over 50 is generally consistent with the ability to perform sustained, full time competitive employment. However, a GAF is not a precise functional assessment, which describes specific mental work related limitations. A GAF between 41-50 can be based upon subjective, unsubstantiated complaints such as having no friends, inability to hold a job, alleged panic attacks, hallucinations, obsessions, or delusions (which have not been observed by the mental health provider), sleep problems, unemployment, inability to obtain health insurance, recent deaths, family relationship problems, or sickness, housing problems, financial problems, substance abuse, and/or criminal problems. The score can be based on behaviors which have little or no relationship to occupational functioning (e.g., The Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. Specifically notes that "frequent shoplifting" can be a basis for a GAF rating in this range). The GAF under 51 does not have to be based upon actual mental status examination findings or psychological testing. Moreover, low GAF scores alone do not compel a finding of disability. See 65 Fed. Reg. 50746, 50764-65, noting that "[t]he GAF scale . . . does not have a direct correlation to the severity requirements in [SSA] mental disorders listings." Although a score of 41-50 indicates serious symptoms that could suggest an inability to hold a job, it does not necessarily mean that a person is unable to meet the basic mental demands of competitive, remunerative, unskilled employment.

(Doc. 9-2, pp. 20-21; Admin. Tr. 19-20).

Ms. Rubendall argues that a GAF score of 50 or below is consistent with a finding of disability, and that the ALJ erred by according "limited" weight to these GAF scores without adequate explanation. (Doc. 11, p. 29-30).

The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). Although the Commissioner has clearly explained that low GAF scores do not have a direct correlation to the severity requirements of the mental disorder listings and are not dispositive on the issue of disability,

50746, 50764 (2000), the district courts in the Third Circuit have repeatedly held that an ALJ's failure to discuss GAF scores of 50 or below may be cause for remand. *See Rivera v. Astrue*, 9 F. Supp. 3d 495, 504-05 (E.D.Pa. 2014). Courts have reasoned that "[b]ecause a GAF score constitutes medical evidence accepted and relied upon by a medical source, it should be addressed by an ALJ in making a determination of disability." *West v. Astrue*, No. 09-2650, 2010 WL 1659712 at *6 (E.D.Pa. Apr. 26, 2010). However, in recent years the American Psychiatric Association has eliminated the GAF scale from its 5th edition of its *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") because of the scale's "conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." DSM-5 16 (2013). For the same reasons, courts have struggled to assess the numerical GAF score where a physician fails to explain which factor or symptom formed the basis of a low GAF score. *See e.g., Gilroy v. Astrue*, 351 F. App'x 714, 715-16 (3d Cir. 2009)("Given the failure of Dr. Wang to 'express any opinions regarding specific limitations' or otherwise explain the basis for his GAF rating, we are at a loss to understand how the ALJ could have responded to that rating in a more satisfactory manner.").

The parties do not dispute that the record contains several GAF scores of 50 or below. However, none of these low GAF scores are accompanied by an explanation of the basis for the GAF score. The revised 4th edition of the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV TR) explains that the GAF scale has two components, the first is symptom severity and the second is functioning. The GAF score always reflects the lower of the two components. DSM-IV TR 32 (2000). Thus, a GAF score between 50 and 41 could be the result of serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), *or* any serious

- 25 -

impairment in social or occupational functioning (e.g., no friends, unable to keep a job). *Id.* at 34. Without an explanation for the basis of the GAF score, an ALJ may decide to discount it pursuant to 20 C.F.R. § 416.927(c)(3)(explaining that a medical opinion may be entitled to more or less weight based on the sufficiency of the supporting explanation). In this case, because the GAF scores were not explained, and because the ALJ's decision reflects that this ambiguity was the basis of his decision to discount these scores, the Court finds that the ALJ's decision to discount the low GAF scores of record is proper under the regulations. Further, because the ALJ scrutinized the treatment records containing these scores, and accorded great weight to Ms. Rubendall's treatment notes the Court finds that his assessment is supported by substantial evidence.

### 3. The ALJ did not Err by According "Significant" Weight to Dr. Urbanowicz's Mental RFC Assessment

Ms. Rubendall alleges that the ALJ erred by according significant weight to the RFC assessment of Dr. Urbanowicz. She asserts that because Dr. Urbanowicz is a non-examining source and because the circumstances under which her opinion was rendered do not fit within the special circumstances noted in SSR 96-6p, this opinion is entitled to little, if any, weight. (Doc. 11, p. 27-28).

In deciding what weight to accord to competing medical opinions, the ALJ is guided by factors outlined in 20 C.F.R. § 416.927(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. *See* 20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 416.902 (defining treating source). Under some

circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. § 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188. With respect to RFC assessments provided by non-examining sources, the Commissioner's policy provides that:

> In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source s medical opinion if the State agency medical or phychological[sic] consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

SSR 96-6p, 1996 WL 374180 at *3.

The parties do not dispute that Dr. Urbanowicz is a non-examining source who rendered a mental RFC assessment after reviewing the records that were available prior to October 15, 2012. (*See* Doc. 9-3, pp. 3-4; Admin. Tr. 67-68)(listing the evidence available at the time Dr. Urbanowicz assessed Ms. Rubendall's RFC); *see also* SSR 96-5p, 1996 WL 374183 at *6 (noting that psychological consultant RFC assessments are assessed as medical opinion evidence at the ALJ hearing level). Ms. Rubendall argues that because Dr. Urbanowicz's medical opinion does not fall within the example listed in SSR 96-6p, that her opinion is entitled to "little" if any weight. However, SSR 96-6p simply provides a non-exhaustive list of examples of possible situations when the opinion of a non-examining state agency medical reviewer – like Dr. Urbanowicz – may be entitled to greater consideration. In grappling with a similar argument, this Court reasoned that:

> Plaintiff provides a brief reference to SSR 96-6p, stating that a State agency opinion can be given greater weight than a treating source only under special circumstances, "such as if the State Agency Consultant's opinion is based on a

review of the complete case record that includes a medical report from a specialist in the individual's particular impairment area which provides more detailed comprehensive information than what was available to the individual's treating source." (Doc. 12 at 26.) This is not a completely accurate recitation of the guidance provided in SSR 96-6p in that the scenario set out by Plaintiff is offered by way of example, explaining the statement that opinions from State agency consultants may be entitled to greater weight than treating or examining sources "[i]n appropriate circumstances." SSR 96-6p (S.S.A.), 1996 WL 374180, at *3 (July 2, 1996). Moreover, Plaintiff does not apply the principle here but rather notes that Dr. Gavazzi had no interaction with Plaintiff and, therefore, his opinion was entitled to "little, if any weight." (*Id.* at 27.) This conclusory statement does not satisfy Plaintiff's burden of showing error, particularly in this situation where the treating source opinions were provided in check-the-box forms and were contradicted by other evidence of record and the State agency consultant provided explanations for his opinion.

*Kreiser v. Colvin*, No. 3:15-CV-1603, 2016 WL 704957 at *13 (M.D.Pa. Feb. 23, 2016); *see also*

*Tolbert v. Colvin*, No. 1:14-CV-2194, 2016 WL 1458236 at *12 (M.D.Pa. Mar. 11, 2016) *report*

*and recommendation adopted by* 2016 WL 1450168 (M.D.Pa. Apr. 13, 2016).

In this case, no treating "acceptable medical source" chose to submit a medical opinion. Further, Dr. Urbanowicz, a non-examining acceptable medical source, reviewed records from inpatient hospitalizations while Ms. Rubendall was a minor, Ms. Rubendall's high school records, treatment records from the Nuestra Clinic, Dr. Yaroslavsky's treatment records and comprehensive psychiatric review, and Ms. Rubendall's own function report. The Court finds that this evidence is substantial, and that nothing in records submitted after Dr. Urbanowicz issued her opinion suggests that Ms. Rubendall's condition radically changed after October 2012. Accordingly, the Court finds no basis to remand simply because the ALJ relied on the opinion of a non-examining acceptable medical source over than of an opinion by a source that is not an acceptable medical source.

D. WHETHER THE ALJ'S RFC ASSESSMENT IS SUPPORTED BY SUBSTANTIAL
   EVIDENCE

During her administrative hearing, Ms. Rubendall testified that she has difficulty concentrating on programs when she watches television, and that her OCD makes it difficult for her to perform pace-work. In a function report, Ms. Rubendall admitted that she cannot pay attention around crowds of people, and does not finish activities that she starts. (Doc. 9-6, p. 79; Admin. Tr. 186). At step three, the ALJ found that Ms. Rubendall had a "moderate" limitation in concentration, persistence, or pace. (Doc. 9-2, p. 16; Admin. Tr. 15). Ms. Rubendall argues that the ALJ's RFC assessment (and the hypothetical question posed to VE Anderson) did not adequately account for the moderate limitations in concentration, persistence, or pace identified by the ALJ at step three.

It is well-established that, for a step-five decision to be supported by substantial evidence all of a claimant's credibly established limitations must be included in an ALJ's function by function RFC assessment and (where applicable) accurately conveyed to a vocational expert. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); SSR 96-8p, 1996 WL 374184. In his RFC assessment, the ALJ accounted for Ms. Rubendall's limitations in concentration, persistence, or pace by limiting Ms. Rubendall to "simple, routine, repetitive tasks in a work environment free from fast-paced production." (Doc. 9-2, p. 17; Admin. Tr. 16). Thus, the Court is called upon to decide whether the above-quoted language is sufficient to account for Ms. Rubendall's moderate limitation in concentration, persistence, or pace.

The most notable Third Circuit case that addresses this issue is *Ramirez v. Barnhart,* 372 F.3d 546, 554-555 (3d Cir. 2004). In *Ramirez*, the Court found that an ALJ did not adequately convey his step three finding that a claimant "often" had limitations in concentration,

persistence, or pace due to a VE by limiting the claimant to "no more than simple one or two-step tasks; no travel outside the workplace; and a reasonable opportunity to receive and make telephone calls." *Id.* at 554. The Court explained that the ALJ's assessment was incomplete because it did not account for a credibly established deficiency in pace. Ms. Rubendall is also correct that courts within the Third Circuit have remanded under similar circumstances where an ALJ failed to account for a credibly established limitation in concentration, persistence or pace. *See Barry v. Barnhart*, No. 05-CV-1825, 2006 WL 2818433 at *9-11 (E.D.Pa. Sept. 28, 2006)(remanding where an ALJ found that there was "no evidence of impaired concentration," where the record contained frequent references to such a limitation); *Steininger v. Barnhart*, No. 04-CV-5383, 2005 WL 2077375 at *3 (E.D.Pa. Aug. 24, 2005)(remanding because an ALJ's RFC assessment and hypothetical question that the claimant be limited to "simple, repetitive tasks," did not adequately account for a moderate limitation in concentration, persistence, or pace). This case, however, is immediately distinguishable from *Ramirez* and its ilk. Unlike in *Ramirez*, the ALJ's RFC assessment (and hypothetical question) in this case conveys a limitation in concentration and persistence (simple, routine, repetitive tasks), and pace (in a work environment free from fast-paced production). Further, Ms. Rubendall fails to explain how these limitations fall short of her abilities. Merely citing to an ALJ's finding that a claimant suffers from moderate limitations in concentration, persistence, or pace at step three in conjunction with *Ramirez* is an insufficient basis for remand. *Orndorff v. Colvin*, No. 1:14-CV-02465, 2016 WL 1458408 at *11-13 (M.D.Pa. Mar. 9, 2016) *report and recommendation adopted by* 2016 WL 1450172 (M.D.Pa. Apr. 13, 2016). Accordingly, the Court finds that Ms. Rubendall's argument lacks merit.

## V.   RECOMMENDATION

Based on the foregoing, it is recommended that the Commissioner's decision be

**AFFIRMED**, and Ms. Rubendall's requests for relief be **DENIED**, as follows:

(1) Final judgment should be entered in favor of Carolyn W. Colvin and against Nicole

   Marie Rubendall;

(2) The Clerk of Court should close this case.

Dated: **August 15, 2016**                               *s/ Karoline Mehalchick*

                                                 **KAROLINE MEHALCHICK**
                                                 **United States Magistrate Judge**

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

NICOLE MARIE RUBENDALL,

                  Plaintiff

        v.

CAROLYN W. COLVIN,
Commissioner of the Social Security
Administration,

                  Defendant

CIVIL ACTION NO. 1:15-CV-1266

(KANE, J.)
(MEHALCHICK, M.J.)

## NOTICE

       **NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **August 15, 2016**.

       Any party may obtain a review of the Report and Recommendation pursuant to Rule

72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**